**NP ANDERSON COTTON EX-CHANGE, L.P., Appellant/Appellee,**

**v.**

**Sandra POTTER d/b/a 7th Street Grill, Appellee/Appellant.**

**No. 2–06–121–CV.**

Court of Appeals of Texas, Fort Worth.

July 12, 2007.

Friedman, Suder & Cooke, P.C., Walker C. Friedman, Christian D. Tucker, and

Elizabeth Sturdivant Kerr, Fort Worth, for Appellant/Cross Appellee.

Bodoin & Agnew, P.C., Mark Edwin Burge, Fort Worth, for Appellee/Cross Appellant.

Panel A: CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### I. Introduction

Appellant and cross-appellee NP Anderson Cotton Exchange, L.P. appeals from a declaratory judgment in favor of appellee and cross-appellant Sandra Potter d/b/a 7th Street Grill giving Potter the option to extend a commercial lease for five additional years and awarding Potter attorney fees.[1] We affirm the trial court's judgment on the lease interpretation, but we reverse the trial court's award of attorney fees and remand for an evidentiary hearing on this point.

### II. Background Facts and Procedural History

#### A. The Parties

Potter is the sole proprietor of the 7th Street Grill restaurant in downtown Fort Worth. Her husband, Rex Potter, is also substantially involved in this family-owned and operated business. The 7th Street Grill has been in its present location for at least sixteen years and, before a menu expansion, was known as the 7th Street Hamburger Company.

NP Anderson is a limited partnership formed for the purpose of acquiring the

---

1. In the interest of clarity, throughout this opinion we refer to the parties as NP Anderson and Potter instead of "appellant or cross-appellee" and "appellee or cross-appellant."

Neil P. Anderson Building, located at 411 West 7th Street in downtown Fort Worth, and developing it from an office building into high-end residential condominiums. NP Anderson is affiliated with the real estate development firm Amicus Interest, LLC and its principals.

## B. The Original January 2001 Lease

Potter, the tenant, and NP Anderson, the landlord, are both assignees of parties who originally entered into the contract disputed in this case. On January 22, 2001, the original and long-time tenants, Mark and Linda Gabioud d/b/a/ 7th Street Hamburger Company, entered into a lease agreement with TCDFW 411 West Seventh, L.P. ("TCDFW"), the original landlord, and then-owner of the Neil P. Anderson building. The January 2001 lease ("2001 Lease") was for a 70–month initial term ending on December 31, 2006, and included the following language: "This Lease shall not be amended, changed or extended, except by written instrument signed by both parties hereto."

Paragraph 42 of the main body of the 2001 Lease also expressly incorporated several attached documents, including "Exhibit 'D'—Special Stipulations," which contained an option for the tenant to renew and extend the lease for one additional term of five years: "Provided no Event of Default exists and Lessee is occupying the entire Leased Premises at the time of such election, Lessee may renew this Lease for one **(1) additional period of five (5) years** on the same terms provided in this Lease." [Emphasis in original.]

Exhibit D of the 2001 Lease also contained the following language, which NP Anderson relies upon to support its argument that the option had lapsed:

Lessee's rights under this Exhibit shall terminate if this Lease or Lessee's right to possession of the Premises is terminated, Lessee assigns any of its interest in this Lease or sublets any portion of the Premises, or Lessee fails to timely exercise its option under this Exhibit, time being of the essence with respect to Lessee's exercise thereof.

## C. The Assignment of the Lease

In mid–2003, Potter, who is Mark Gabioud's sister and had gained substantial experience managing parts of the 7th Street Hamburger Company for the Gabiouds, obtained a Small Business Administration loan of $150,000 to purchase the business. Potter purchased the business, expanded the menu, and gave the restaurant its new name, the 7th Street Grill.

Potter, Mark and Linda Gabioud, and then-landlord TCDFW all signed a Consent to Assignment ("2003 Consent") that was effective May 27, 2003. In the trial court, the most debated portion of the 2003 Consent was the following clause:

Assignee [Potter] agrees to assume Assignor's [the Gabiouds'] obligations under the Lease and to accept the premises in their present "AS IS" condition. It is agreed and understood that the aforesaid Lease shall remain in full force and effect *without modification except as expressly set forth herein. Accordingly, all remaining terms, conditions, and provisions of such Lease shall remain unchanged in full force and effect and are ratified and confirmed.*

**Landlord [TCDFW] consents to this assignment.** [Emphasis added.].

TCDFW and NP Anderson entered into a "Purchase and Sale Agreement" on April 6, 2004. On that same day, TCDFW prepared an Estoppel Certificate for Potter to sign "in connection with the potential building sale." This certificate verified that the only amendment to the 2001

Lease was the 2003 Consent. The certificate also stated,

> [Potter] has no right or option whatsoever to purchase or otherwise acquire the premises leased pursuant to the Lease ... except as follows ...: *Extension Option—One (1) additional period of five (5) years on same terms by delivering (90) days written notice before expiration of the original term.* [Emphasis in original.]

### D. NP Anderson's Acquisition of the Neil P. Anderson Building and the Subsequent Litigation

On June 23, 2004, pursuant to their Purchase and Sale Agreement, NP Anderson purchased the Neil P. Anderson Building from TCDFW. Upon closing, NP Anderson received an assignment of leases, including Potter's, and thus became the new landlord.

At some point between June and November of 2004, NP Anderson announced plans to convert the Neil P. Anderson Building from offices to luxury condominiums. Potter originally sued NP Anderson for specific performance (to stop the conversion), for a declaratory judgment that the conversion was improper under the governing rules and regulations of the building, for breach of contract (diminution of sales and consequential damages), and for tortious interference with contract.[2] She later filed a Second Amended Original Petition to add a declaratory judgment claim regarding whether she could extend the 2001 Lease. NP Anderson then filed its own request for declaratory judgment arguing that the Gaboiud–Potter assignment terminated any assignee's right to an extension, which would have required Potter to vacate by December 31, 2006.

After the trial court denied a wave of summary judgment motions, the remaining claims—largely Potter's claim for breach of contract damages and the parties' competing declaratory judgment actions concerning the existence of a five-year lease extension option—went to trial. At the trial of Potter's breach of contract claim regarding NP Anderson's conversion of the building from office to residential use, the jury found that NP Anderson had successfully modified the 2001 Lease to permit residential dwellings and had therefore not breached the 2001 Lease.

Regarding Potter's lease extension claim, the parties disputed the meaning of the language in the 2003 Consent. Potter argued that the language and other circumstances surrounding the assignment meant that the parties agreed she acquired the same five-year lease extension option that the Gabiouds had under the original 2001 Lease. NP Anderson argued that the 2003 Consent did not give Potter the same extension option that the Gabiouds had.

The trial court found that the 2001 Lease and the 2003 Consent, when read together, were ambiguous as a matter of law. Consequently, the trial court submitted a question to the jury to "interpret the Assignment of Lease as applied to the Extension Option" by determining whether the parties to the 2001 Lease and the 2003 Consent *intended* for Potter (the assignee) to have an option to renew and extend the lease for an additional five years after the 2001 Lease and primary term expired (Question No. 4). The jury concluded that "the parties to the Potter Lease intended that Sandy Potter would have the option to extend and/or renew the lease for an additional period of five years."

---

**2.** Historically, the 7th Street Grill was a lunch-only, Monday–through–Friday restaurant with an office worker clientele, so Potter could have seen a reduction in profits if NP Anderson converted the building from office to residential use.

The jury also determined that "a reasonable fee for Sandy Potter's attorneys in this case" was $212,753.50 for preparation and trial, $30,000 for the first appeal, and $15,000 for an appeal to the Texas Supreme Court. The trial court entered judgment on the jury's verdict that Potter had the contractual right and option to extend the 2001 Lease for five years and awarded Potter's attorneys reduced fees of $75,000 for trial preparation, $20,000 for a successful initial appeal, and $12,500 for a successful appeal to the Texas Supreme Court. NP Anderson appealed, challenging the trial court's rulings on both the extension and the attorneys' fees, and Potter filed a conditional cross-appeal.

### E. Potter's Cross–Appeal

Potter asks us to consider her cross-appeal raising jury charge error in only two situations: (1) if we reverse the trial court's declaratory judgment on the lease extension option or (2) if we reverse the award of her attorneys' fees to Potter for any reason except to remand the case to the trial court for a new evidentiary hearing on attorneys' fees and re-entering of judgment on that basis. Thus, we address NP Anderson's points first.

### III. The Lease Assignment and Extension

In its first issue, NP Anderson argues that the trial court erred by overruling its objection to submitting Question No. 4 to the jury, by denying its motion to disregard the jury's answer to that question, and by denying its motion for partial new trial based on Question No. 4.

### A. Standard of Review

■ The trial court determined that the 2001 Lease and 2003 Consent, when read together, were ambiguous as a matter of law. A trial court's conclusions of law are reviewed de novo. *Huntley v. Enon Ltd. P'ship*, 197 S.W.3d 844, 849 (Tex. App.-Fort Worth 2006, no pet.). We accord no deference to the lower court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1998). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Boyd v. Boyd*, 67 S.W.3d 398, 404 (Tex.App.-Fort Worth 2002, no pet.).

### B. Applicable Law

■ We apply well-established rules of contract interpretation when construing the 2001 Lease and the subsequent writings. *See Huntley*, 197 S.W.3d at 849. Specifically, when construing a written contract, our primary concern is to ascertain the true intent of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). We must examine and consider the entire lease and its subsequent writings in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Coker*, 650 S.W.2d at 393; *see Bd. of Ins. Com'rs v. Great S. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (Tex.1951) (holding that multiple instruments executed at different times may be read together as a single writing if they were part of the same transaction). If the written instrument is so worded that it can be given a definite or certain legal meaning, then the contract may be construed as a matter of law. *Coker*, 650 S.W.2d at 393.

■ Moreover, all contractual provisions should be considered with reference to the entire instrument, and no single provision taken alone should be controlling. *J.M. Davidson*, 128 S.W.3d at 229. A simple lack of clarity or disagreement between parties does not render a term

ambiguous. *See DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999). Rather, an ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. *Id.*

 For an ambiguity to exist, both potential meanings must be reasonable. *Id.* Whether a contract is ambiguous is a question of law for the trial court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker,* 650 S.W.2d at 394. Only when a contract is first determined to be ambiguous should the court consider the parties' interpretations, which are questions of fact. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981).

## C. Analysis

NP Anderson asserts that the 2001 Lease's *unambiguous* language supersedes all other documents, including the 2003 Consent. Therefore, according to NP Anderson, the trial court should have determined the 2001 Lease to be unambiguous as a matter of law, and the trial court erred in concluding otherwise. Potter, conversely, argues that the 2001 Lease and subsequent 2003 Consent, when read together, unambiguously granted her the option to renew and extend her lease for five additional years.

The interpretation of the 2001 Lease and 2003 Consent rests largely on the reading of three provisions. The 2001 Lease between TCDFW and Mark and Linda Gabioud contained the following language:

> Lessee's rights under this Exhibit shall terminate if this Lease or Lessee's right to possession of the Premises is terminated, Lessee assigns any of its interest in this Lease or sublets any portion of the Premises, or Lessee fails

to timely exercise its option under this Exhibit, time being of the essence with respect to Lessee's exercise thereof.

The language provides that if a lessee assigns any of its interest in the 2001 Lease or sublets any portion of the premises, the lessee's rights shall terminate. In this case, there was a wholesale substitution of one lessee for another lessee with the express consent of the landlord. The 2003 Consent, which was prepared by then-landlord TCDFW and agreed to by Potter, provides,

> It is agreed and understood that the aforesaid Lease shall remain in full force and effect without modification *except as expressly set forth herein.* Accordingly, all remaining terms, conditions, and provisions of such Lease shall remain unchanged in full force and effect and are ratified and confirmed.
>
> *Landlord consents to this Assignment.* [Emphasis added.]

Thus, the 2003 Consent states that all conditions of such lease will remain in full force and effect, including the termination provision.

 NP Anderson contends that the assignment to Potter (contained within the 2003 Consent) terminated Potter's option to extend because the 2001 Lease stated that the "Lessee's rights," including the extension right, "shall terminate if ... Lessee assigns any of its interest in this Lease." If this were true, however, the clause within the 2003 Consent stating, "the aforesaid Lease shall remain in full force and effect without modification except as expressly set forth herein," would be rendered meaningless. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex.2005) (stating the courts must examine the entire writings and give effect to all provisions of the contract so that none will be rendered meaningless). More

importantly, language within the main text of the 2001 Lease empowered the parties to the lease to amend or change the terms of the lease. Specifically, paragraph 41 of the 2001 Lease provided, "[t]his Lease shall not be amended, changed or extended, *except by written instrument* signed by both parties hereto." [Emphasis added.] *See Givens v. Dougherty,* 671 S.W.2d 877, 878 (Tex.1984) (holding that parties to a written contract within the parameters of the Statute of Frauds may modify contracts in writing); *BACM 2001–1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.,* 218 S.W.3d 137, 145–46 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that a modification to a contract need not restate all the essential terms of the original agreement); *Boudreaux Civic Ass'n v. Cox,* 882 S.W.2d 543, 547–48 (Tex. App.-Houston [1st Dist.] 1994, no writ) ("A modification to a contract creates a new contract that includes the new, modified provisions and the unchanged old provisions.").

■ The 2003 Consent was a valid modification of the 2001 Lease, as it was written and signed in accordance with paragraph 41 of the 2001 Lease. *See* TEX. BUS. & COM.CODE ANN. § 26.01(b)(5) (Vernon Supp.2006) (providing that a lease of real estate for a term longer than one year must be in writing); *Givens,* 671 S.W.2d at 878. Further, the 2003 Consent only provided for one change to the 2001 Lease—a substitution of parties, the lessees. Any assignment of the 2001 Lease would require the lessor's written consent in order to avoid the automatic termination language contained in Exhibit D of the 2001 Lease, and here, the lessor gave its written consent. Thus, save that one modifica-

tion, all other provisions of the 2001 Lease, including the option to extend, remained "in full force and effect."[3] *See Boudreaux Civic Ass'n,* 882 S.W.2d at 547–48. Further, NP Anderson was provided a copy of the Estoppel Certificate that specifically disclosed both the existence of the assignment to Potter and existence of the Extension Option.

■ By concluding that the 2003 Consent prevented the 2001 Lease extension forfeiture from being triggered, we are harmonizing all instruments so as to not render any provision meaningless. *See id.* Reading the 2001 Lease and the 2003 Consent as separate parts of the same contract, we conclude that the contract can be given a definite and certain legal meaning and is, therefore, unambiguous. *See J.M. Davidson, Inc.,* 128 S.W.3d at 229. We hold that the 2001 Lease and 2003 Consent unambiguously gave Potter an option to renew and extend the 2001 Lease for an additional five-year period after December 31, 2006. Although the trial court erred in determining that the contract was ambiguous, the jury's answer to Question No. 4 renders the error harmless. *See N.M. Uranium, Inc. v. Moser,* 587 S.W.2d 809, 815 (Tex.Civ.App.-Corpus Christi 1979, writ ref'd n.r.e.). Accordingly, we overrule NP Anderson's first point.

## IV. Attorney Fees

In its second point, NP Anderson argues that the trial court erred in awarding attorney fees to Potter because she did not carry her burden of either segregating the fees or showing that segregation was impossible and because the grounds for the fee award were divorced from any evidence.

---

**3.** The clause in the 2001 Lease restricting Potter from assigning any of her lease is also still in effect. Hence, if Potter conducts a transaction assigning a portion of her lease

without the consent of NP Anderson, Potter's rights under the extension option would then be terminated.

## A. Standard of Review and Applicable Law

 The grant or denial of attorney fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 143 (Tex. App.-El Paso 1997, pet. denied); *see Ridge Oil Co. v. Guinn Invs. Inc.*, 148 S.W.3d 143, 163 (Tex.2004) (using an abuse of discretion standard of review when evaluating non-declaratory judgment actions); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex.1998) (same); *Aaron Rents, Inc. v. Travis Cent. Appraisal Dist.*, 212 S.W.3d 665, 669 (Tex.App.-Austin 2006, no pet.) (op. on reh'g) (same). Under the Texas Declaratory Judgment Act ("Act"), a court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997); *Jones v. Krown*, 218 S.W.3d 746, 750 (Tex.App.-Fort Worth 2007, pet. filed). "The statute ... affords the trial court a measure of discretion in deciding whether to award attorney's fees or not" and places few restrictions on this discretion. *Bocquet*, 972 S.W.2d at 20–21. Reasonableness and necessity are fact questions; the equity and justice of the fee award are left to the trial court's discretion. *Ridge Oil Co.*, 148 S.W.3d at 161; *Bocquet*, 972 S.W.2d at 21; *Krown*, 218 S.W.3d at 750.

 Implicit in any award of attorney fees is that they are authorized. A party seeking attorney fees is required to segregate fees incurred on claims allowing recovery of fees from those that do not. *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex.1997); *Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 316 (Tex.App.-Dallas 2006, no pet.); *Hill*, 964 S.W.2d at 143. An exception to the duty to segregate arises when the party's claims are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. TEX.R.APP. P. 44.1(a); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex.2006); *Emerson Elec. Co.*, 201 S.W.3d at 316; *Hill*, 964 S.W.2d at 143. Thus, Potter must segregate the fees among her claims or establish that the claims are sufficiently related. *See Chapa*, 212 S.W.3d at 311; *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991); *Emerson Elec. Co.*, 201 S.W.3d at 316; *Hill*, 964 S.W.2d at 143.

## B. Analysis

██ Potter argues that NP Anderson forfeited this point by not objecting to her lack of fee segregation until after the close of Potter's case-in-chief. However, it was Potter's burden either to segregate the fees or show that she was unable to do so. *See Chapa*, 212 S.W.3d at 311; *Sterling*, 822 S.W.2d at 11; *Emerson Elec. Co.*, 201 S.W.3d at 316. Further, by moving for a directed verdict and by objecting to the jury charge based on Potter's failure to segregate her attorneys' fees, NP Anderson alerted the trial court to its complaint; at that point, the trial court could have required Potter to offer evidence showing that the fees could not be segregated. *See* TEX.R.APP. P. 33.1; *Mandell v. Mandell*, 214 S.W.3d 682, 691 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *Sterling*, 822 S.W.2d at 11 (holding that it is not necessary to object to attorney fee evidence for lack of segregation at the time it is offered; an objection to the jury charge on this issue is sufficient).

At trial, Potter brought several claims against NP Anderson. Potter originally sued NP Anderson for specific performance (to stop the office conversion), for a

declaratory judgment that the conversion was improper under the governing rules and regulations of the building, for breach of contract (diminution of sales and consequential damages), and for tortious interference with contract. She later filed a Second Amended Original Petition to add a declaratory judgment claim regarding whether she could extend the 2001 Lease. The trial court granted summary judgment in favor of NP Anderson regarding Potter's specific performance and tortious interference with contract claims. The remaining claims went to trial. At the trial of Potter's breach of contract claim regarding NP Anderson's conversion of the building from office to residential use, the jury found that NP Anderson had successfully modified the 2001 Lease to permit residential dwellings and had therefore not breached the 2001 Lease.[4] Thus, the *only* claim that Potter prevailed upon at trial was her *declaratory judgment* action brought on the lease extension claim and her related attorneys' fees.

When a party pleads several causes of action including a request for a declaratory judgment and an award of attorney fees and is subsequently awarded declaratory relief but denied other relief, the party is entitled only to those attorney fees attributable to the declaratory judgment action. *See Hill,* 964 S.W.2d at 143; *Canales v. Zapatero,* 773 S.W.2d 659, 662 (Tex.App.-San Antonio 1989, writ denied) (op. on reh'g). Hence, absent evidence

showing that Potter's attorneys' fees on all of her claims were inextricably intertwined, she should have received her attorneys' fees only for the declaratory judgment on the lease extension claim. *See Aiello,* 941 S.W.2d at 73; *Hill,* 964 S.W.2d at 143; *Canales,* 773 S.W.2d at 662.

In response to NP Anderson's motion for a directed verdict regarding the lack of segregation in Potter's attorneys' fees, Potter's counsel did not provide guidance about what fees were reasonable, necessary, equitable, and just. Further, Potter's counsel never testified or argued that he was unable to segregate the fees because the facts surrounding the claims were inextricably intertwined. *See Chapa,* 212 S.W.3d at 311; *Sterling,* 822 S.W.2d at 11; *Emerson Elec. Co.,* 201 S.W.3d at 316. Despite this, the trial court stated that "the fees [for all of Potter's claims] are inextricably intertwined" and held that "as a matter of law they are not segregable." Other than stating, "I'm going to tell you that I know that they're inextricably intertwined. I can see the fabric of it," and alluding to its trial experience, the trial court gave no explanation for its conclusion. Thus, even though Potter prevailed only on the declaratory judgment action, proof of her attorneys' fees on this successful claim was never segregated from her other unsuccessful claims.[5]

We agree with NP Anderson's assertion that Potter's lease extension claim involves entirely different facts than her building

4. The jury considered Potter's declaratory judgment claim that the conversion was improper under the governing rules and regulations of the building alongside with Potter's breach of contract claim.

5. The jury awarded Potter $212,753.50 for preparation and trial, $30,000 for a successful first appeal, and $15,000 for a successful appeal to the Texas Supreme Court. The questions submitted to the jury regarding Potter's attorneys' fees were not segregated by causes

of action. However, the questions submitted regarding NP Anderson's causes of action were segregated. At the hearing on Potter and NP Anderson's motions for entry of judgment and NP Anderson's motion to disregard the jury findings, the trial court reduced this award to $75,000 for trial preparation, $20,000 for a successful initial appeal, and $12,500 for a successful appeal to the Texas Supreme Court.

conversion claims. To prevail on her theories that NP Anderson acted wrongly in changing the building's use and character, Potter had to prove that either the rules and regulations under the 2001 Lease or Texas law forbade those changes without NP Anderson incurring liability. In contrast, to prevail on her declaratory judgment claim regarding the lease extension, Potter had to prove that the 2001 Lease and the 2003 Consent did not trigger the loss of the extension option.

■ Potter argues that the trial court has extremely broad discretion under the Act to award attorney fees and did not abuse that discretion. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009. Indeed, in declaratory judgment actions, the trial court has the discretion not only to award attorney fees but also to award less than the amount determined by a jury to be reasonable and necessary. *See Ridge Oil Co.*, 148 S.W.3d at 161–62. Here, however, because it was possible that Potter could have prevailed on some, but not all, claims, the trial court should have required evidence of segregation before sending this case to the jury. *See Chapa*, 212 S.W.3d at 311; *Sterling*, 822 S.W.2d at 10; *Emerson Elec. Co.*, 201 S.W.3d at 316; *Hill*, 964 S.W.2d at 143. Failure to do so was an abuse of discretion.

Because the trial court abused its discretion by awarding Potter's unsegregated attorneys' fees, we need not reach NP Anderson's sufficiency challenge. *See Hill*, 964 S.W.2d at 143 (remanding for new trial on attorney's fees, but not conducting a factual sufficiency review, when plaintiff failed to segregate fees relating to successful declaratory judgment action from other unsuccessful claims). Accordingly, we sustain NP Anderson's second point.

## V. Costs

■ All portions of the designated record were necessary for our review. Therefore, we tax costs equally to both parties based on the entire record as supplemented. *See* TEX.R.APP. P. 34.6(c)(3).

## VI. Conclusion

Having overruled NP Anderson's first point and sustained its second point, we reverse the trial court's award of her attorneys' fees and remand this case to the trial court for the sole purpose of conducting an evidentiary hearing on attorney fees and entering a new judgment on that basis. Because we reverse and remand this case on the issue of attorney fees, we need not reach Potter's cross-appeal.

CAYCE, C.J. concurs without opinion.